McVICAR REALTY TRUST CO. v. UNION RY. POWER & ELECTRIC CO. et al.

(Circuit Court, D. New Jersey. April 28, 1905.)

1. MORTGAGE—FORECLOSURE—NEGOTIABLE BONDS—FRAUD.

On a suit by a trustee to foreclose a mortgage securing negotiable bonds, *held* that, while the general rule is that a holder of such securities purchased in the open market is a bona fide holder, and the burden of proof is upon him who would attack such title, nevertheless when the mortgage and bonds are found to have been without consideration, and fraudulent in their inception, the burden shifts, and the holder must show that he was an innocent purchaser.

[Ed. Note.—For cases in point, see vol. 8, Cent. Dig. Bonds, § 222.]

2. SAME—EVIDENCE—BONA FIDE HOLDERS.

*Held*, also, under the evidence, that the mortgage and the bonds in question were fraudulent, and without consideration, and that those claiming to hold the bonds were not bona fide holders.

(Syllabus by the Court.)

In Equity.

Northrop & Griffiths, for complainant.

McCarter, Williamson & McCarter, for defendants.

CROSS, District Judge. The complainant is trustee under a mortgage executed by the defendant Union Railway Electric Company, which purports to have been issued to secure $100,000 of its bonds of the par value of $500 each, with interest thereon at the rate of 6 per cent. per annum, payable semiannually. The bill of complaint was filed to foreclose this mortgage, and among other things alleges that subsequent to its execution 112 of such bonds were issued. The mortgage was dated July 1, 1902, and the bonds were to run for a period of 20 years. The Union Railway Power & Electric Company was organized May 12, 1902, under the laws of the state of New Jersey, with a nominal capital of six million of dollars. The main promoter of the company was one Frank C. Hollins, who had at the time an office in Wall street, in the city of New York, where he conducted business under the name of F. C. Hollins & Co. His office adjoined that of J. F. Pierson, Jr., & Co., of which latter firm his son was a member. Subsequently Hollins procured the incorporation of a new company, known as the American Union Electric Company. This corporation had a nominal capital of seven millions of dollars, and almost its earliest act was to authorize the purchase of 90 per cent. of the capital stock of the Union Railway Power & Electric Company, after which it immediately took possession of all the assets of that company. These assets consisted of property belonging to the several subsidiary companies which Hollins had bought up prior to its incorporation, and which had been turned

over to it when it was incorporated. It should be said at this point that it appears incontrovertibly from the testimony that both of the above-mentioned corporations were of the flimsiest character. Each of their boards of directors was what is popularly known as a "dummy" board. The testimony shows that the directors had only a nominal interest in their respective corporations; that they knew absolutely nothing of their affairs; that such resolutions as were adopted at the meetings of the boards were prepared in advance in a lawyer's office, and were introduced and passed by the directors without any knowledge as to their propriety, importance, or effect. They even testified—or some of them did—that they did not know where the property of their corporations was situated, and, although the board of directors of the mortgagor passed a resolution that that company was indebted to the American Union Electric Company in the sum of $57,000, yet as a matter of fact they could not testify whether that company was so indebted or not. Many of the statements of these directors show such alarming ignorance, and such utter disregard of official duty as seem incredible. It would take pages to properly set forth and characterize them, but this is wholly unnecessary.

The corporation last organized practically had no property except such as it acquired from the earlier company, and this was of inconsiderable value. It is now in the hands of Frederick K. Day, receiver, who has filed an answer herein, setting up that the mortgage under foreclosure was and is fraudulent, and without consideration, and his interest in this suit lies in the fact that, if he succeeds, the stock of the mortgagor company which he holds as receiver will have some value. It is unnecessary to go into the evidence in detail to show that the mortgage was of this character. Suffice it to say that beyond question the allegations of the answer in the above respects are proven. As above stated, there is no evidence to show that at the time the bonds under this mortgage were issued there was any indebtedness due from the Railway Power & Electric Company to the American Union Electric Company, as a resolution of the former company declared when it issued the bonds. Instead of having been issued to pay any such indebtedness, they appear to have been issued for the purpose of reimbursing Hollins for moneys which he had expended for the running expenses of the subsidiary companies taken over by the mortgagor. These advances, however, under his agreement made with the owners, corporate and individual, of the various concerns so bought up and taken over, were to be made without security, and without payment other than from the profits which he might derive from the sale of the stock of the Union Railway Power & Electric Company. The clear understanding of such owners with Hollins was that they were to take stock in said corporations for their properties, that he was to make the necessary advances to run the same, that he would accept like stock in payment for such advances, and that there should be no mortgage put upon the property. The doubtful character of the mortgage under foreclosure was so clearly shown while

the testimony was being taken that counsel for the complainant. promptly withdrew all claim on the outstanding 112 bonds, excepting 24, which are claimed to have been purchased by the Misses Hollins, daughters of said Frank C. Hollins. There are three of these ladies interested equally in the 24 bonds above mentioned, and counsel contends that they are bona fide holders thereof, and that as to these bonds the mortgage is a valid and subsisting lien against the property described in said mortgage.

The rule of law in general is that the burden of proof is upon the defendant to show that a person holding negotiable securities purchased in the open market is not a bona fide holder; but, while this is so, nevertheless in cases where there is clear proof of fraud or illegality shown in the issue of such securities the burden of proof shifts, and the holder is then required to show that he is an innocent purchaser. The question for present consideration, then, is this, were the Misses Hollins bona fide holders of the 24 bonds in question? The principal evidence offered to maintain this contention is given by one Lamberson and by one of the three Misses Hollins. The other two ladies, although equally interested, were not sworn, nor was their absence accounted for, although it appears that they all lived in the city of New York. I am not disposed to give much credence to the testimony of the one who was sworn, both because at various points it was contradicted by that of the witness Lamberson, and because of her unwillingness to testify fully, or at all, on several material points. Her story is that she and her sisters invested about $9,000 in 24 of these bonds in the year 1902; that she had had previous investments in various stocks and bonds; that some of these were sold, and the bonds in question purchased from the proceeds of the sale of such earlier investments. She further states that she received the bonds from her brother, who was a member of the firm of J. F. Pierson, Jr., & Co., and that the particular stock which had been sold and the proceeds of which were invested in these bonds was Steam Pump preferred, which, however, she says had been sold without her direction. Lamberson, on the contrary, says that he delivered the bonds to her, but took no receipt therefor, and adds that they were purchased with the proceeds of an entirely different stock than the one she alleges. Furthermore, she cannot say of whom or when she purchased the Steam Pump preferred. On cross-examination the witness, under the advice and direction of her father, who was sitting by, refused to answer any questions which would tend to throw light upon the transaction. Among these questions were the following: "How many shares of Steam Pump preferred were sold when these bonds were purchased? What is Steam Pump preferred? How long had you owned the Steam Pump preferred? By whom had you obtained it? What had you paid for it? Was the Steam Pump preferred bonds or stock?" There were many other similar questions which the witness either declined to answer at all or to which she simply answered, "I do not care to say." Under these circumstances, if her testimony is discredited, she had no one to blame but herself.

The matter was a proper one for investigation, and when pertinent and proper questions were put to her by counsel on cross-examination she took refuge in silence. Of the witness Lamberson it may be said that he was a clerk both in the office of Frank C. Hollins and in the office of J. F. Pierson, Jr., & Co., but was not a member of either firm. Much in his evidence is manifestly superficial, and some of it hearsay. For instance, in one place, in answer to the following question, "And all that you know about the rest of it is that J. F. Pierson, Jr., & Co. told you that these bonds were to be held for the Misses Hollins in lieu of what they owned them?" He answered, "Which bonds?" and upon it being explained that the bonds referred to were the bonds of the Union Railway Power & Electric Company, he answered, "Yes." Furthermore, his evidence is not only uncertain and self-contradictory, but is contradicted by that of Miss Hollins, whose claim he is endeavoring to support. It is quite obvious, therefore, that but little reliance can be placed upon it. It should be added in this connection that Frank C. Hollins says in his testimony that he himself sold the bonds to his daughters, and it also appears by the testimony of one Bailey, after Miss Hollins says she owned the bonds, that Hollins told him (Bailey) that he had given $12,000 of the bonds to a married daughter, and added that he had all of the bonds in his safe, including his daughter's. There is also evidence which shows that both Lamberson and the firm of J. F. Pierson & Co. must have known all about the inception, character, and comparative worthlessness of these bonds. Upon what theory, then, did they sell other securities belonging to Miss Hollins without her request, and substitute these bonds? Her own brother was a member of that firm, and if we take her testimony it was he who delivered the bonds to her. Why did she take them without objection? Or, if she did object, why has she not told us so, and told us why? Why is it that no member of this firm was called as a witness? They knew all there was to know about the affair, and could have told us whether the Misses Hollins were bona fide holders. Then, too, it must be borne in mind that the Miss Hollins who testified did not deny that she and her sisters knew of the tainted character of these bonds. For all that appears from her testimony, she may have known all that her father or brother knew. An obvious intent to cover up and conceal appears throughout this part of the case, which does not bespeak the favorable consideration of the court.

Under the circumstances detailed—and they might be added to almost indefinitely—it is impossible to escape the conclusion that the Misses Hollins are not bona fide holders of the bonds they claim to own. We are rather inclined to think, as was suggested by counsel of the defendant, that this whole matter is but an attempt on the part of Frank C. Hollins to secure a portion of the bonds, the whole issue of which in the first instance he intended for himself.

The bill of complaint will be dismissed, with costs.